**MARINE OIL CO., Limited, v. CUTLER BROS., Inc., et al.**

No. 5525.

Court of Appeal of Louisiana, Second Circuit.

Jan. 3, 1938.

Rehearing Denied Jan. 28, 1938.

Theus, Grisham, Davis & Leigh, of Monroe, G. Frank Purvis, Jr., of Rayville, and Adam H. Harper, of New Orleans, for appellant.

Warren Hunt and T. J. Coenen, Jr., both of Rayville, for appellees.

HAMITER, Judge.

In an effort to obtain satisfaction of a moneyed judgment which was awarded to it against Cutler Brothers, Incorporated, in cause No. 8965 on the docket of · the Fifth judicial district court of Richland parish, plaintiff instituted this suit against Premium Petroleum Products, Incorporated, and Cutlers, Inc. The two last-named corporations are one and the same, there having been merely a change of name under a charter amendment. For convenience and to avoid confusion, we shall refer to the defendant in this proceeding as the Premium Company.

Plaintiff seeks to hold the Premium Company liable for the indebtedness under the averment and theory that the latter acquired all of the worthwhile assets and is merely a continuation of the judgment debtor corporation, Cutler Bros., Inc. It alleges in the alternative that the assets were transferred in bad faith and in fraud of creditors.

The primary prayer of the petition is for judgment against defendant for the amount of its judicially recognized claim. In the alternative, it prays that the above-mentioned transfer of assets be annulled and set aside. In the further alternative, plaintiff prays that the assets be decreed subject to seizure and sale under its existing judgment.

The Premium Company, in its answer, denied generally the averments of the petition. It affirmatively alleged that the transfer of assets was in good faith and for a good, valid, and legal consideration, and that the judgment debtor maintained its corporate status after the transfer.

After trial of the merits of the case, there was judgment rejecting plaintiff's demand. It appealed.

Appellee has filed in this court a motion to dismiss the appeal. Under this motion it shows that on February 9, 1937, plaintiff's counsel moved in open court for orders of appeal. These were granted and the appeal made returnable to this court on or before April 1, 1937; but no appeal was perfected thereunder. On April 26, 1937, the same counsel moved in open court and obtained new orders of appeal, returnable here on or before June 1, 1937. A devolutive appeal was perfected under these

orders. The contention is then made that the new orders of appeal should not have been granted without citation or notice of some kind being given to appellee. It is argued that a watch was kept for the filing of an appeal bond under the original motion, and when such bond was not filed, the appeal was regarded as having been abandoned. We are cognizant of no law, and have been cited to none, which sustains appellee's position under the motion to dismiss. Orders of appeal may be obtained either by petition or by motion in open court, at the same term at which the judgment was rendered. Code Prac. art. 573. The word "term," as used in the cited codal article, is synonymous with the word "session," and if the appeal is taken within the same ten-month session, in which the judgment is rendered, as was done in the instant case, no citation is necessary. Deal v. Sovereign Camp, W. O. W., La.App., 161 So. 621.

■ With reference to the obtaining of more than one order for a devolutive appeal during such term or session, appellants' counsel, in their brief, correctly give our view when they state that "the appellant can secure as many orders of devolutive appeal as he desires where he has not attempted to perfect the same by filing a bond. Since the appeal could not be perfected without filing a bond, there is no way to abandon something that never existed."

The motion to dismiss is overruled.

Proceeding now to a consideration of the merits of the case, it is to be observed that Cutler Bros., Inc., the judgment debtor, was chartered on February 5, 1926, with an authorized capital of $50,000, divided into and represented by 500 shares of stock of the par value of $100 each. The stock was subscribed for as follows: R. B. Cutler, 229 shares; C. C. Cutler, 229 shares; E. L. Cutler, 22 shares; and D. M. Williamson, 20 shares. The officers of the corporation were R. B. Cutler, president, E. L. Cutler vice president, and C. C. Cutler, secretary-treasurer. Its objects and purposes, as expressed in the charter, were:

"To own, lease, maintain and operate automobile filling stations, to buy and sell, both at wholesale and retail, gasoline motor oils and all lubricating oils commonly used in automotive power; to buy and sell tubes, tires, and all kinds of automobile parts, tools, implements and automobile accessories of every kind; to own, sell and rent all kinds of automobiles, trucks, tractors, and all other vehicles driven by motor power; to buy, own, sell, and lease and trade in all kinds of real estate; to build, repair and construct houses both for itself and as a business; to do a general wholesale and retail business in all kinds of automobile accessories; to carry on the business of washing, repairing and cleaning cars; to buy, sell and trade in stock in other corporations; to borrow money and issue promissory notes or bonds therefor and to secure the same by mortgage or pledge of any or all of its property; to make, accept and execute promissory notes, bills of exchange and other negotiable instruments, and to do all things necessary and incidental for the objects and purposes for which this corporation is formed."

While conducting its operations and activities, said corporation contracted an indebtedness with plaintiff company, which on July 1, 1931, balanced the sum of $712.70. Between that date and September 28, 1932, it paid $150 on the account, thus leaving due $562.70. It was this last-mentioned amount for which plaintiff obtained judgment against its said debtor, Cutler Bros., Inc., on April 20, 1934.

On the above-mentioned date of July 1, 1931, Premium Petroleum Products, Incorporated, was organized for the stated purposes of—

"1. To buy, own and sell at retail or wholesale, for cash or on terms of credit, goods, wares, merchandise, gasoline, oils, grease, tires, tubes, automobile accessories, service station supplies, and any and all other things used in connection with or designed to be used in connection with bulk gasoline stations, automobile garages and storage warehouses and service stations.

"2. Generally to engage in the business of wholesale and retail purchasing and sale of all petroleum products, automobile accessories, garage, automobile storage, and service stations.

"3. To manufacture, prepare and mark any of the above species of property under a trade name or as the product of another."

The capital stock of the last-mentioned corporation was fixed at the sum of $10,000, divided into 100 shares of the par value of $100 each. The entire stock was subscribed for and issued as follows: Cutler Bros., Inc. (the judgment debtor), 95 shares; R. B. Cutler, one share; C. C. Cutler, one share; E. L. Cutler, one share; Warren Hunt, one share; and Winnie Kline, one share. The corporation's officers were: R. B. Cutler, president; E. L. Cutler, first vice president;

Warren Hunt, second vice president; Winnie Kline, secretary; and C. C. Cutler, treasurer. The share held by each of the Cutlers was, according to the testimony of C. C. Cutler, paid for partly with cash and the balance in services; and this constituted all of the cash paid to the corporation for issued stock. The two shares held by Warren Hunt and Winnie Kline were paid for with services rendered. The subscriber for the remaining 95 shares, which was the judgment debtor, Cutler Bros., Inc., obtained its stock by the transfer to the newly organized corporation of personal or movable property having an appraised value of $9,500. This consisted of office furniture and fixtures valued at $905, merchandise worth $500, and gasoline trucks and garage equipment; and it constituted all of the personal property owned by the transferor, except certain accounts and notes receivable which C. C. Cutler estimated to be worth approximately $40,000.

With reference to the aforementioned transfer, the charter of the newly organized corporation provides:

"Appearers attach hereto and make a part hereof a list of property, with values thereof, which are agreed upon by them to be just and fair values, and at which prices they purchase same from Cutler Brothers, Incorporated, and in payment thereof issued ninety-five (95) fully paid for nonassessable shares of the capital stock of this corporation."

Numerous parcels of real estate were owned by Cutler Bros., Inc., at the time of the chartering of the Premium Company, but none of this was included in the transfer. However, most of that real property was heavily burdened with mortgages and other encumbrances.

On November 27, 1934, the charter of Premium Petroleum Products, Inc., was amended so as to change the name of the corporation to "Cutlers, Inc."

The management and control of both Cutler Bros., Inc., and the Premium Company were vested entirely and exclusively in R. B. and C. C. Cutler.

The 95 shares of stock issued by the Premium Company to Cutler Bros., Inc., in payment of the conveyed property, eventually was acquired by C. C. Cutler, R. B. Cutler, and E. L. Cutler in their individual capacities. The testimony of C. C. Cutler regarding this acquisition is:

"We worked for the Cutler Bros., Inc., and just barely drew out enough money out of it to live on, not drawing all our salary, just left our credit in there. We took that stock for our salary."

This suit against the Premium Company was instituted July 30, 1936. At the time of its trial in December, 1936, Cutler Bros., Inc., was carrying on no business.

■ In view of the facts of this case, further discussion of which will be hereinafter given, we are of the opinion that the Premium Company is merely a continuation of Cutler Bros., Inc., and that under the jurisprudence of this state the former is liable for the debts contracted with plaintiff by the latter.

■ The Louisiana Supreme Court in the case of Wolff v. Shreveport Gas, Electric Light & Power Company, 138 La. 743, 70 So. 789, 794, L.R.A.1916D, 1138, with Mr. Justice Monroe as its organ, stated:

"It has been said that transactions whereby the interests of two or more corporations become identified are susceptible of arrangement into four general groups, and that:

"'The first of such groups comprehends consolidations proper, where all the constituent companies cease to exist, and a new one comes into being; the second, cases of merger proper, in which one of the corporate parties ceases to exist, while the other continues. The third group comprehends cases where a new corporation is, either in law or in point of fact, the reincarnation of an old one. To the fourth group belong those transactions whereby a corporation, although continuing to exist de jure, is in fact merged in another, which, by acquiring its assets and business, has left of the other only its corporate shell.' Atlantic & B. R. Co. v. Johnson, 127 Ga. 392, 56 S.E. 482, 11 L.R.A.(N.S.) 1119, note.

"According to the consensus of judicial opinion in this country, a newly organized corporation is liable for the debts of an old one, to the business and property of which it has succeeded, where it is shown that the succession was the result of a transaction entered into in fraud of the creditors of the old corporation, or that the circumstances attending the creation of the new, and its succession to the business and property of the old, were of such a character as to warrant the finding that the new, is merely a continuation of the old, corporation. * * *

"In the case of a sale, in good faith, of the property and business of a strictly private corporation, duly authorized by its shareholders, to a third person, for an adequate consideration, the property would no doubt pass free of incumbrance, and the creditors would be relegated to the proceeds in the hands of the debtor corporation; but, where the purchaser is a new corporation, composed of the same shareholders as the old, the transaction, in no manner, affects the rights of the creditors of the old corporation, who may proceed for the recovery of the amounts due them against either corporation, or both; and that, whether the claims be founded in contract or tort, since the real debtor, though represented by two corporations instead of one, remains the same, in contemplation of law."

In the case of W. F. Taylor v. Gulf Land & Lumber Company, 119 La. 426, 44 So. 187, we find:

"The Leesville Lumber Company, represented by Stables, president, and Powell, secretary, transferred all of its personal property, consisting of sawmill and all of its appurtenances, equipments, locomotive shops, 35,000,000 of stumpage, for the price of $140,000. The Leesville Company also sold to defendant some lands owned by it situated in Vernon Parish.

"After these sales there remained to it a small planing mill at some distance from the main plant, and its open accounts, of little value.

"This sale put an end to the business of the Leesville Lumber Company, as it never attempted to do any business after this sale.

"The obligation of defendant on the note on which suit had been brought by plaintiff presents the first question.

"The argument is advanced by defendant that it is an independent and separate corporation, and is not in any way indebted to the Leesville Lumber Company, Limited. We do not find it possible to agree with that proposition. The defendant is in possession of the property that formerly belonged to the Leesville Lumber Company. This property has given to the defendant the value it has. * * *

" 'A reorganization may take place by the formation of a new corporation and the transfer to it of the assets of the old corporation in consideration of the issue of stock of the new company to shareholders of the old; but the rights of creditors cannot be prejudiced thereby.' 10 Cyc. 286.

"Garland Jones, the attorney who drafted the charter and by-laws of the Gulf Land & Lumber Company, testified that he was told by Stables, president, and majority stockholder in both corporations, that the new company was to take over all the property of the old company. The new company had no assets of its own and was a fake concern, unless we assume that the intent was to reorganize the old company."

The cases just quoted from are cited approvingly in the comparatively recent case of Alliance Trust Company v. Streater, 182 La. 102, 112, 161 So. 168.

The record in the instant case convinces us that Cutler Bros., Inc., possessed heavy and pressing financial burdens at the time of the organization of the Premium Company. In this connection, we might observe that subsequent to that date, but obviously for debts created prior thereto, other judgments in the following amounts and in favor of the named creditors were obtained against it: Seiberling Rubber Company, Inc., $3,551.38, and Lion Oil Refining Company, $1,111.76.

Copies of the assessment roll for the year 1931, which were filed in evidence, reveal seven separate assessments of real estate to Cutler Bros., Inc., in that year. Five of these items, as disclosed by other documentary evidence, were affected with mortgage or other recorded encumbrances, and we are of the belief that the owner's equities therein were not large. Of these five items, some were later sold in satisfaction of the mortgage indebtedness resting against them, while others were adjudicated at tax sale to the Premium Company. Only two parcels of the real estate appear to have been unencumbered on July 1, 1931, the date of the chartering of the new corporation. One of these, a 40-acre tract of land in Richland parish, La., assessed at $1,100, was conveyed on November 9, 1931, to Richard Garley, with the consideration provision of the deed reciting that:

"The price for which the above sale is made is the sum of $1250.00 receipt of which is hereby acknowledged and full acquittance granted therefor."

This may have been a cash consideration, but the provision "and full acquittance granted therefor" suggests a transfer in

satisfaction of an existing debt. The remaining unencumbered parcel consisted of property in the town of Girard, La., assessed at $2,150. This was conveyed to the Lion Oil Refining Company under a deed dated September 12, 1931, and containing the provision that "the price for which the above sale is made is the sum of $5000.00 cash in hand paid, the receipt of which is hereby acknowledged and due acquittance granted therefor." As shown by oral evidence, this deed was executed as part payment of an indebtedness owed to the transferee.

The accounts and notes receivable retained by Cutler Bros., Inc., which Mr. Cutler's testimony disclosed were in the amount of approximately $40,000, were either of small actual value, or else the unsecured indebtedness of the corporation was enormous. This statement is made in view of the hereinabove mentioned judgments obtained and the fact that only $150 was paid on plaintiff's account of $712.70 subsequent to the formation of the new corporation.

Thus it may be said that the facts revealed by the evidence in the record, particularly the involved financial condition of Cutler Bros., Inc., at the time of the organization of the Premium Company, the transfer of the important and valuable assets for no consideration other than the issuance of stock, and the almost identical personnel of the two corporations, compel a conclusion that merely a continuation of the original debtor resulted from the organization and operation of the new corporation, and that the latter is liable in this suit.

Our holding herein does not conflict with that in Sinclair Refining Company v. Rayville Motor Company, 160 So. 179, decided by this court. In the cited case the newly organized corporation issued 90 shares of stock of the par value of $50 each and these were paid for in cash. From these proceeds, the sum of $650, which constituted a small portion of the capital, was paid to the old or debtor corporation in consideration of its transfer of garage and office equipment and other items, all valued at approximately that amount. In the instant case, the Premium Company received no cash in payment of stock issued, except the small amounts paid by the Cutlers on the three shares issued to them; and no cash was paid to the debtor corporation for the assets transferred, the con-

sideration for this conveyance, as before stated, being merely the issuance to the transferor of 95 of the 100 authorized shares of stock to the transferee company.

■ The plea of prescription of one year has been filed in this court by appellee to the alternative demand of appellant which possesses the form of a revocatory action. Appellant's main demand, and the one which we are herein sustaining, is in the nature of a suit on a quasi contract or an implied assumpsit of the debt (Heard v. Monroe Sand & Gravel Company, Inc., 9 La.App. 568, 121 So. 642), and the prescriptive period applicable to revocatory actions has no application here.

For the reasons assigned, the judgment of the trial court is avoided and reversed, and there is now judgment in favor of plaintiff, Marine Oil Company, Limited, and against the corporation formerly known as Premium Petroleum Products, Incorporated, but now possessing the name of Cutlers, Inc., in the sum of $562.70, with 5 per cent. per annum interest on $511.49 of said amount from October 23, 1929, until paid, and like interest on $51.21 of said amount from September 20, 1932, until paid, and all costs in said suit entitled Marine Oil Company, Ltd., v. Cutler Bros., Inc., No. 8965 on the docket of the Fifth judicial district court of Richland parish, La. It is further ordered that defendant pay all costs of this suit.